liSCHOTT, Chief Judge.
This is a suit between two attorneys over the break-up of their law firm which was in the form of a professional law corporation (PLC). The principal issue is whether a Buy/Sell agreement concerning the stock obliged the PLC to purchase plaintiffs stock following his resignation.
Plaintiff and defendant started practicing law together in 1976 and established a PLC in 1979 with each owning fifty percent of the stock. In 1986 they admitted two associates to the firm giving each one five percent of the stock and retaining forty-five percent each. After years of successful practice with the firm, in 1991 plaintiff became dissatisfied with defendant’s performance and began pressuring him to devote more time to the practice and to keep records on his time. In April 1991, the parties agreed that plaintiff would be given an increase of $35,000 in compensation and a Lexus automobile.
Over the next few months, the relationship between the parties rapidly deteriorated and culminated with plaintiffs resignation from the firm on August 29, 1991. According to plaintiff it was defendant who was planning to leave the firm, while defendant testified that plaintiff was trying to dissolve the firm during the months leading up to plaintiffs departure. In any event, it was clear | ato all that a split between the two was imminent and there was much posturing on the part of both parties to protect their interests and to secure the alliance of the other attorneys in the firm.
*205 In 1986 when the parties brought the two associates in the firm, the four of them and the PLC entered into a Buy/Sell agreement with respect to the stock in the PLC. On September 12, 1991, plaintiff offered to sell his shares of the stock to the PLC in accordance with the Buy/Sell agreement. The firm did not accept the offer and plaintiff filed suit.
In his suit plaintiff claimed that his resignation was forced on him, the Buy/Sell agreement did not apply, and the defendants (the PLC and all shareholders) were obliged to purchase his stock for a reasonable price. In the alternative he claimed that the defendants were bound to purchase his stock in accordance with the Buy/Sell agreement. He also alleged that defendants were liable for damages in tort and under the doctrine of abuse of rights.
The trial court rendered judgment in plaintiffs favor and against the PLC for $271.68 to reimburse him for expenses and for $18,150 for a fee the defendant was paid for representing a family member. The court also awarded the Lexus automobile to plaintiff. The court dismissed all other claims and counter claims. Plaintiff appealed and defendant answered the appeal.
Some of the assignments of error raised by both parties in this court apply to findings and conclusions of the trial judge in his oral reasons for judgment which were not included in the judgment itself. For example, the judge found that there was no breach of the Buy/Sell agreement by the defendants because plaintiff failed to make a tender of the stock in accordance with the agreement. Even though this was dispositive of plaintiffs claim the judge went on to interpret the meaning of the Buy/Sell agreement and to place a value on the stock. The judge also made a finding that plaintiff resigned from | sthe PLC under duress even though this finding has no application to the judgment.
Although these gratuitous and irrelevant findings are not properly before this court, because they are wrong and could lead to the wrong consequences in the event these parties continue to litigate their differences after the present case becomes final, we have resolved to consider some of these findings. We are also motivated to do so for the benefit of any reviewing court which may consider this case.
Plaintiffs first assignment of error is directed to the Buy/Sell agreement and his contention that he had an employment contract which protected him from being terminated by the PLC. The trial court correctly found that plaintiff had no employment agreement. In 1985 an employment agreement was entered into between plaintiff and PLC. The contract provided that plaintiff’s employment commenced on October 1, 1985 “and shall terminate if not renewed on October 1, 1986.” (Emphasis supplied) Although this contract was not renewed, plaintiff and the PLC entered into an “Amended Employment Agreement” on October 1, 1989. This provided that the previous employment agreement of October 1, 1985, was “extended and renewed” until September 30, 1990. It provided for an annual guaranteed salary of $224,000 and that all other provisions of the 1985 agreement would remain the same. (Plaintiffs annual salary under that agreement was $175,000.)
Because the 1989 agreement expired by its own terms on September 80, 1990, and was not renewed, there was no agreement in effect when plaintiff resigned in September 1991. Plaintiffs argument that it was extended by custom is meritless. .The earlier agreement which was ostensibly renewed in 1989 provided that it would expire unless affirmatively renewed. This action was not taken with respect to either contract. Additionally, the terms of the|41989 contract were changed when, in the spring of 1991 plaintiffs annual compensation was increased by $35,000.
In the absence of an employment contract, the PLC could terminate plaintiffs employment at will. LSA-C.C. art. 2747. For this reason alone it is difficult to understand why the trial judge concluded that plaintiffs resignation was given under duress. The record establishes that plaintiff had made up his mind to separate from the defendant and was trying to persuade the other lawyers in the firm to stay with him. He was actively involved in a power play to force the defen *206 dant either to operate according to his directions or to leave. Defendant was able to turn the tables and to secure the backing of the two associates who were now directors of the PLC. Consequently, when plaintiff realized he was a minority stockholder and had only one of five votes on the board of directors he set about to make the best arrangement for himself in exchange for his resignation. Either he would resign or he would be terminated. If that constituted duress it was entirely legitimate and plaintiff has no legal basis to complain.
With respect to the Buy/Sell agreement, even if we assume that plaintiff properly tendered his stock, the PLC and the individual defendants were under no obligation to purchase any of it. The pertinent part of the Buy/Sell agreement provides as follows:
3. If any shareholder, desires to sell all or any part of his shares in the Firm; or, if a shareholder desires to resign from employment by the Firm as described in ARTICLE VIII of the Employment Agreement to be executed by the shareholder, a copy of which is attached hereto as Exhibit A; or, if a shareholder is terminated in his capacity as an employee of the Firm as described in ARTICLES XI and XII of the Employment Agreement; the shareholder shall offer to sell his shares to the Firm on the following terms:
a. Within thirty (30) days after the shareholder gives notice to the Firm of his intent to sell all or part of his shares, or his intent to resign from employment by the Firm, or within thirty (30) days after the Firm notifies | gthe shareholder in writing of his termination as an employee of the Firm, the Firm shall have the right and the obligation to purchase all or any part of the shareholder’s shares at a per share price determined in accordance with Paragraph Four (4). (Emphasis supplied).
Plaintiff contends that the language emphasized above obliged the PLC to buy all of his stock at a price in excess of one million dollars. After deliberating over this language at great length the trial judge concluded that had plaintiff properly tendered his stock the PLC would have been bound to buy it. Here the trial court erred by failing to recognize one of the basic rules for the interpretation of contracts which is found in Article 2050 of the Louisiana Civil Code. This provides:
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.
Following the provisions quoted above, the Buy/Sell agreement provides that any shares not purchased by the PLC shall be offered to the shareholders who are given the right to purchase amounts in proportion to their stock ownership. The agreement provides that only upon the PLC and the other shareholders declining to purchase may the departing shareholder sell to an outsider. Then there is the standard language that before he can sell his stock for a lesser price the PLC and the other shareholders have the right of first refusal.
The error of the trial judge and plaintiff is their failure to read all of these provisions together in order to determine the intent of the parties. To seek intent by inference from one contract provision to the exclusion of another contact provision disregards La. C.C. Article 2050. Barrera v. Ciolino, 636 So.2d 218, 223 (La.1994).
| gOne does not have to be a specialist in corporate law to understand the intent of the parties to this Buy/Sell agreement. One needs only to read paragraph 3 in its entirety and its meaning is crystal clear. The PLC has the first option to buy the stock at the price offered. Next the shareholders have the option to buy. No one has to buy anything. These provisions are typical of most closely held corporations. The fact that one sentence was inartfully drawn does not deprive the contract as a whole of its obvious intent. The trial court erred in concluding that the PLC was theoretically bound to purchase any of plaintiffs shares.
While the foregoing disposes of the principal issues raised by plaintiff as well as those raised by defendants in their answer to the *207 appeal, we are left with a number of secondary assignments of error made by plaintiff.
First, plaintiff invokes the legally ethical prohibition against fee splitting among attorneys to require the PLC to purchase his shares at his price. The simple answer is that no one as a practical matter expects the PLC to pay dividends to its shareholders because to do so would defeat one of the primary purposes for forming a PLC in the first place — to save taxes. The only way plaintiff could receive a part of a fee would be in the form of a dividend which is not likely to occur. Neither the Rules of Professional Conduct nor the laws of this state require the PLC to repurchase plaintiff’s stock.
Next, plaintiff claims damages for tortious conduct including tortious interference with his contractual rights, use of force and duress, abuse of rights and unfair trade practices. None of this has merit. As already stated plaintiff had no employment contract and he can still properly exercise his rights under the Buy/Sell agreement. He was not the victim of force and duress but rather he resigned voluntarily after failing to take over the control of the firm. The doctrine of abuse of rights has no application to this situation where the ^defendants had a legitimate interest in protecting their law practice and did no more than the law and their contracts with plaintiff authorized them to do. Nothing in the record supports a conclusion that defendants acted immorally, unfairly, or in bad faith. Finally, the record does not support plaintiff’s charge that defendants’ conduct constituted unfair trade practices.
With respect to the Lexus automobile plaintiff testified that the ear was given to him in compensation. Defendant testified the PLC gave him only the use of the car while he was employed there. The court resolved this factual issue in plaintiffs favor. We are not persuaded that this conclusion is manifestly erroneous. The same rationale applies to the issues of the office furnishings and the $18,500 fee paid to defendant. These conclusions are not manifestly erroneous. However, the trial court incorrectly awarded the $13,500 to plaintiff. This amount is to be paid by defendant to the PLC.
Accordingly, the judgment appealed from is affirmed, but amended to require payment by defendant of the $13,500.00 to the professional law corporation.

AFFIRMED AND AMENDED.